The CROW TRIBE OF INDIANS, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Plaintiff-Intervenor,

v.

STATE OF MONTANA: Ellen Feaver, Director, Montana Department of Revenue; Big Horn County, Montana; Yellowstone County, Montana; Treasure County, Montana; Lorraine Hamilton, Treasurer, Big Horn County, Montana; May Jenkins, Treasurer, Yellowstone County, Montana, Claribel Bonine, Treasurer, Treasure County, Montana, Defendants.

Westmoreland Resources, Inc., Defendant-Intervenor.

No. CV–78–110–BLG.

United States District Court, D. Montana, Billings Division.

Sept. 10, 1985.

Francis X. Lamebull, Harlem, Mont., for plaintiffs.

David W. Hoefer, Deputy Yellowstone Co. Atty., Billings, Mont., James E. Seykora, Big Horn Co. Atty., Hardin, Mont., James R. Carlson, Jr., Treasure Co. Atty., Hysham, Mont., for counties.

Jerome Anderson, John Ross, Anderson Law Firm, Billings, Mont., Chris Tweeten, Asst. Atty. Gen., Helena, Mont., Helena S. Maclay, Deidre Boggs, Missoula, Mont., for State of Mont.

Byron H. (Pete) Dunbar, U.S. Atty., Billings, Mont., Steven E. Carroll, Asst. Atty. Gen., Land & Natural Resources, Washington, D.C., for U.S.

George Miller, Dechert, Price & Rhoads, Philadelphia, Pa., R.H. Bellingham, Moulton Law Firm, Billings, Mont., Daniel Israel, Cogswell & Wehrle, Denver, Colo., for Westmoreland.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTIN, Chief Judge.

Plaintiff, the Crow Tribe of Indians, has filed this civil action challenging the validity of the Montana Coal Severance Tax and the Montana Gross Proceeds from Coal Tax insofar as these taxes are applied to coal produced on the Tribe's reservation and to coal produced on a ceded strip of land situated adjacent to the reservation. The Tribe seeks injunctive, declaratory, restitutionary, tax and money refunds, money damages, and other relief. Although this Court and the Court of Appeals considered the tax with respect to mining on both locations on a motion to dismiss, the evi-

dence at trial led this Court to conclude that there is no case or controversy with respect to coal mined on the reservation. *See infra* Conclusion of Law II. The following findings, therefore, focus on coal mined on the ceded strip.

This matter came on for trial before the Court, sitting without a jury, on January 9, 1984. The plaintiff was represented by counsel Robert S. Pelcyger and Dale T. White of Boulder, Colorado. Defendants were represented by counsel Jerome Anderson and John W. Ross of Billings, Montana, Assistant Attorney General Chris D. Tweeten of Helena, Montana, Treasure County Attorney James R. Carlson, Jr., of Hysham, Montana, Big Horn County Attorney James E. Seykora of Hardin, Montana, and Yellowstone County David W. Hoefer of Billings, Montana. Defendant-intervenor Westmoreland Resources, Inc., was represented by Gerald B. Murphy of Billings, Montana, and Daniel H. Israel of Denver, Colorado. The plaintiff-intervenor United States was represented by Department of Justice attorney Stephen E. Carroll. From the testimony and evidence submitted by the parties and the briefs and arguments of counsel, the Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

*Parties*

1. The plaintiff, Crow Tribe of Indians, is an American Indian tribe, with the governing body, the Crow Tribal Council, duly recognized by the United States Secretary of the Interior as the governing body of the Crow Indian Reservation.

2. The defendant State of Montana is a sovereign state of the Union, pursuant to the Enabling Act of February 22, 1889, 25 Stat. 676. Defendants Big Horn County, Yellowstone County, and Treasure County are political subdivisions of the State of Montana. Defendant Hamilton is Treasurer of Big Horn County; defendant Jenkins is Treasurer of Yellowstone County; defendant Bonine was Treasurer of Treasure County.

3. Defendant-Intervenor Westmoreland Resources, Inc., is a Delaware corporation having its principal place of business at Billings, Montana.

*Ceded Strip—Creation and Description*

4. The Crow Reservation was first set apart by the Treaty of Fort Laramie, 11 Stat. 749 (1851), and encompassed 38.5 million acres in what is now southern Montana and northern Wyoming. The second Treaty of Fort Laramie, entered into in 1868, 15 Stat. 649, reduced the Crow Reservation to 8 million acres situated entirely within what is now the State of Montana. The 1868 treaty set apart the reservation for the absolute and undisturbed use and occupation of the Crow Tribe. *Montana v. United States*, 450 U.S. 544, 547–48, 101 S.Ct. 1245, 1249, 67 L.Ed.2d 493 (1981).

5. The 1868 treaty was followed by three major cessions of territory by the Crow Tribe: the Act of April 11, 1882, 22 Stat. 42, the Act of March 3, 1891, 26 Stat. 989, and the Act of April 27, 1904, 33 Stat. 352. The third, 1904, cession reduced the Crow Reservation to its present boundaries and created the "ceded strip," an area consisting of about 1,137,500 acres which lies to the north of the acknowledged reservation.

6. Large deposits of coal underly both the Crow Reservation proper and the ceded strip.

7. Most of the surface in the ceded strip is owned in fee by non-Indians.

8. The ceded area has a population of approximately 4600. Approximately 1% of the population is Indian.

9. The ceded area has been developed by non-Indians pursuant to state and county governmental law and regulation.

10. Land use within the ceded strip is primarily range land, irrigated cropland, hay land, pasture, forest cover, and non-irrigated cropland. Rural residential housing is located throughout the ceded strip.

11. The ceded strip includes one incorporated municipality, numerous unincorporated communities, a variety of special districts, and public school districts which are governed by state law.

12. The ceded area is not a legally constituted political subdivision of the State of Montana, but it lies within the boundaries of Big Horn, Treasure, and Yellowstone Counties. It does not conform to any political or administrative boundaries for which any economic or demographic data are normally collected. It receives full governmental representation in accordance with state law. This ceded area is located in the Thirteenth and Sixteenth Judicial Districts of the District Courts in the State of Montana.

*Ownership of Coal Underlying the Ceded Strip*

13. In 1904, the Crow Tribe ceded "all right, title, and interest" in the area presently referred to as the ceded strip. Act of April 27, 1904, 33 Stat. 352. The United States agreed to act as trustee for the Tribe, to dispose of the ceded lands under the various reclamation, homestead, and mineral laws, and to pay the Indians the proceeds of the sales. *See* 33 Stat. at 361. The Indians released their possessory right to the ceded strip lands but retained a beneficial interest in the undisposed-of ceded lands. *See Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920).

14. In accordance with the 1904 Cession Act, lands within the ceded strip were disposed of by the United States. Under § 5 of the Act, the State of Montana received sections 16 and 36 for the support of common schools. 33 Stat. at 360. Some allotments to individual Indians were made under § 4. 33 Stat. at 358–59. The remaining lands in the ceded strip were opened to homestead entries. Under § 5, lands were offered for settlement for the price of $4 per acre. The lands that could not be sold for this price were to be offered for sale at a lesser price under such presidential proclamations as were deemed necessary. Further dispositions were made under a number of presidential proclamations. *See* May 24, 1906, 34 Stat. 3200; September 9, 1910, 36 Stat. 2742; August 9, 1912, 37 Stat. 1759; September 28, 1914, 38 Stat. 2029; and April 6, 1917, 40 Stat. 1653.

15. Under the 1904 Act and these various proclamations, a considerable amount of both surface land and mineral estate was conveyed to non-Indians. A few thousand acres of surface lands were never conveyed. The patents issued to non-Indians for approximately 70,000 acres of coal lands expressly excluded rights to the underlying minerals in favor of the United States.

16. In 1934, Congress enacted the Indian Reorganization Act (IRA). 25 U.S.C. § 461 et seq. Under § 3 of the IRA, 25 U.S.C. § 463(a), the Secretary of the Interior was authorized to restore to tribal ownership "the remaining surplus lands of any Indian reservation opened before June 18, 1934...."

17. Three months after the IRA's enactment, in September 1934, the Secretary temporarily withdrew the surplus or open Indian lands that the United States had been authorized to sell as trustee or broker for Indian tribes. 54 I.D. 559 (1934). This Secretarial Order expressly withdrew the previously undisposed-of surface lands and minerals in the Crow ceded area. *Id.* at 561–63.

18. The Secretarial Order terminated, at least temporarily, leasing by the federal government of the previously undisposed-of minerals within the ceded area pursuant to the mineral leasing laws governing public lands. In due course, the surplus or ceded lands, including previously undisposed-of mineral interests, of tribes that elected to accept the IRA were restored to tribal ownership. *See, e.g.,* 59 I.D. 393 (1947); 60 I.D. 174 (1948).

19. The Crow Tribe elected not to accept the provisions of the IRA. *See* 25 U.S.C. § 478. Consequently, these surplus or ceded lands were not restored to tribal ownership under 25 U.S.C. § 463.

20. The Act of May 19, 1958, Pub.L. No. 85–420, 72 Stat. 121, provided

[t]hat all lands now or hereafter classified as vacant and undisposed-of ceded lands (including townsite lots) on the following named Indian reservations are hereby restored to tribal ownership subject to valid existing rights: ... Crow,

Montana—10,260.95 [acres] ... *Provided,* That such restoration shall not apply to any lands while they are within reclamation projects heretofore authorized.

Sec. 2. Title to the lands restored to tribal ownership by this Act shall be held by the United States in trust for the respective tribe or tribes, and such lands are hereby added to and made a part of the existing reservations for such tribe or tribes.

Sec. 3. The lands restored to tribal ownership by this Act may be sold or exchanged by the tribe, with the approval of the Secretary of the Interior.

21. The two major purposes of the 1958 Act, as revealed by its legislative history, were to treat non-IRA tribes in a similar manner as IRA tribes with respect to ceded or surplus lands and to restore to tribal ownership all the surface lands and mineral interests that were withdrawn from entry by the Secretarial Order (54 I.D. 559 (1934)). S.Rep. No. 1508 (85th Cong., 2d Sess. 1–2, 2–3 (1958); H.Rep. No. 1336, 85th Cong., 2d Sess. 1–2 (1958)). Both committee reports state:

> This legislation, if enacted, will restore the lands [temporarily withdrawn by, *inter alia,* the September 1934 Order] to tribal ownership, thus terminating the right of the Federal Government to dispose of them under the cession statutes, and will assure the Indians the continued use rights.

*Id.* The reports expressly refer to the Secretarial Order which withdrew the previously undisposed-of ceded surface lands and mineral interests.

22. If the ceded strip minerals in which the Crow Tribe retains a beneficial interest were not restored to full tribal ownership by the 1958 Act, the Crow Tribe would not receive the same treatment as the tribes whose lands and minerals were restored under § 3 of the IRA, 25 U.S.C. § 463. *See* 60 I.D. 174 (1948); 59 I.D. 393 (1947). Similarly, excluding the Tribe's ceded strip minerals from the coverage of the 1958 Act would conflict with that Act's express purpose of fully restoring to tribal ownership all of the surface lands and minerals that

had been temporarily withdrawn in September 1934.

23. No significance can be attached to the use of the term "vacant and undisposed-of ceded lands" in the 1958 Act instead of the "surplus lands" language from § 3 of the IRA. *See* 25 U.S.C. § 463. The legislative history discloses why different language was used in these similar Acts.

24. S. 1757, the bill introduced by Senators Murray and Mansfield, and H.R. 3490 and H.R. 6160, predecessor bills introduced by Representative Metcalf, had used the phrase "surplus ceded lands of the class mentioned in the Indian Reorganization Act of June 18, 1934, Section 3 (48 Stat. 984; 25 U.S.C. § 463)" in § 1 of the bills to describe the lands that would be restored to tribal ownership. In its comments on these bills, the Interior Department recommended that the lands be described instead "as vacant and undisposed of ceded lands" in order to "avoid the necessity for a cross reference" to the IRA. The Interior Department's report expressly stated that the recommended change "relate[d] to matters of form and do[es] not affect the substance of the bill." S.Rep. No. 1508, at 3; H.Rep. No. 1336, at 3.

25. The 1958 Act was intended to, and did in fact, fully restore the previously undisposed-of minerals in the Crow ceded strip to the full beneficial ownership of the Crow Tribe. The right and power of the United States to lease or sell those minerals was terminated. This Court expressly so held in *Redding v. Morton,* CV–74–12–BLG (D.Mont.1974):

> In 1958, Congress restored to the Crow Tribe all of the undisposed of lands in the ceded area. 72 Stat. 121 (1958). The Interior Department has interpreted this series of enactments and case law to mean that the Crow Tribe owns all of the coal underlying the surface within the ceded area. Consequently, it must be concluded that the Crow Tribe was never divested of its title to coal which was not conveyed when the United States disposed of the surface land.

*Id.,* Slip Op. at 8. The Court of Appeals did not reach the merits of the title question in

the appeal of the *Redding* case. *Cady v. Morton*, 527 F.2d 786, 791, 798 (9th Cir. 1975).

26. The Act of August 14, 1958, 72 Stat. 575, amended the 1958 Act by authorizing the purchase by the federal government of the Tribe's right to some 4900 acres within the ceded area included within the Huntley Reclamation Project. The effect of the August 1958 Act was to reduce the surface lands restored under the May 1958 Act to approximately 5360 acres. S.Rep. No. 1508, at 4–5. A provision in the August 1958 Act evidences Congress' intent to restore minerals in the ceded strip to the Crow Tribe. § 1 of the August 1958 Act provides for the Tribe's retention of the minerals underlying these 4900 acres, and § 2 of that Act, 72 Stat. at 582, states "that the minerals reserved for the benefit of the Crow Tribe pursuant to Section 1 hereof shall be leased or otherwise disposed of under the laws and regulations relating to Indian trust lands."

27. The Department of the Interior has consistently treated the undisposed-of lands and minerals in the ceded area as being held in trust for the Crow Tribe. In a circular issued to explain the application of the Act of February 27, 1917, 39 Stat. 944, one of the Acts which permitted entry of the surface estate and reservation of the mineral estate, the General Land Office recognized that the Tribe retained a beneficial interest in the minerals after the surface estate was conveyed. Exhibits introduced at trial also showed that the Bureau of Indian Affairs has consistently treated the undisposed-of minerals as being held in trust for the Tribe.

28. There is a clear, consistent, and contemporaneous administrative construction by the Interior Department that the undisposed-of minerals underlying the Crow ceded area were restored to full tribal ownership by the 1958 Act. *See* Exhibits 97, 87, D–435, 128.

29. Both the Crow Tribe and Westmoreland Resources have relied on this consistent administrative interpretation. This reliance is manifested by an investment of tens of millions of dollars in a coal mine.

*Surface Coal Mining on the Ceded Strip*

30. In June 1972, Westmoreland, a non-Indian company, entered into two leases with the Crow Tribe to mine coal underlying about 31,000 acres of the ceded strip. One of these leases, encompassing over 16,000 acres, was cancelled in 1982 by mutual consent of Westmoreland, the Tribe, and the federal government. The second lease remains in effect and authorizes production of coal on Tract III which is located in Big Horn County on the ceded strip in sections 25, 26, and 36, Township 1 North, Range 37 East.

31. In 1974, Westmoreland's leases were amended to reflect a renegotiation and consequent increase in the Tribe's royalty rate. Agreement was also reached to renegotiate the royalty rate in ten years to a point at or about the prevailing market rate.

32. The coal leases and subsequent amendments were the result of arm's-length negotiations between Westmoreland, the Tribe, and the federal government. The leases and amendments were subject to federal approval and were approved by the Secretary of the Interior. The Tribe was free to accept or reject the terms of the agreements.

33. In October 1972, Westmoreland began construction of its "Absaloka Mine" on Tract III. Mine facilities were built on the lease tract, and a 36–mile railroad spur line was built along Sarpy Creek to connect the minesite with the Burlington Northern line in Treasure County, Montana.

34. Surface coal mining operations at Westmoreland's Absaloka Mine commenced in Spring of 1974. Production reached 4 million tons in 1975 and has remained relatively constant, reaching a peak of 4.9 million tons in 1979 and declining since 1981. Under long-term sales contracts entered into in 1974, Westmoreland annually ships approximately 4 million tons of coal to four mid-west utilities. Such deliveries are to continue through 1993.

*Surface Coal Mining on the Crow Indian Reservation*

35. Although negotiations have taken place between the Crow Tribe and various mining companies, and some preliminary prospecting and exploration has been accomplished, no actual mining of coal by non-Indian lessees has occurred within the boundaries of the Crow Indian Reservation.

36. In April 1983, the Secretary of the Interior approved a 1980 coal mining agreement between the Crow Tribe and Shell Oil Company for a coal tract situated in the extreme southeastern corner of the Crow Reservation immediately north of the Wyoming border. Shell has not mined coal on the reservation nor does it have any current long-term contracts to sell reservation coal.

*Governmental Services and Jurisdiction on the Ceded Strip*

37. Since 1904 the State of Montana and its political subdivisions have had legal authority and responsibility for the provision of public services on the ceded strip. The state and its political subdivisions exercise exclusive jurisdiction on the ceded strip.

38. Public services provided by the state and local governments to the ceded strip include general government services, public safety, health and welfare, natural resources, public works, transportation, recreation, and culture and education.

39. The state makes available services to and exercises jurisdiction over the counties containing the ceded strip and the ceded strip itself in the same manner as it would for all other counties, or portions thereof, within the state. The state provided specific evidence that at least 11 public agencies of the state are involved in various governmental activities on the ceded strip. These state agencies include: the Department of Agriculture; Department of Commerce; Department of Fish, Wildlife, and Parks; Department of Highways; Department of Justice; Department of Health; Department of Labor; Department of State Lands; the Montana State Library; Department of Natural Resources and Conservation; and the Department of Public Service Regulation. This list does not represent the entirety of state involvement in governmental activities on the ceded strip.

40. The total cost of these services cannot be precisely documented. The state's budgeting process is a complex, interrelated system, and it is not appropriate to look at one or a few components of that system in isolation. The budgetary process is not designed to identify all monies expended in response to a certain area or taxpayer or recipient. The budgetary process and accounting system is not designed to trace funds from a taxpayer to an expenditure.

41. Big Horn, Treasure, and Yellowstone Counties have historically provided and continue to provide, numerous and various services to the ceded strip. County and local governments have jurisdictional authority on the ceded strip.

42. Throughout the ceded strip, law enforcement is provided by the counties. In some cases law enforcement is provided by a consolidated city/county law enforcement agency. A courthouse building is located in the county seat of each County to provide administrative facilities for the function of general government in the ceded strip. The counties provide recreational facilities as well as health and welfare, library, emergency medical, and fire-fighting services. The ceded area is completely encompassed within the elementary and secondary school districts in the three counties. The extent and cost of these facilities and services are substantial as evidenced by both the value of physical assets and the budgets of the counties.

43. There are approximately 105 miles of Federal Interstate Highway, 45 miles of state primary and secondary highways, and 600 miles of paved and unpaved county roads located on the ceded strip. The county governments of Big Horn, Treasure, and Yellowstone have responsibility for paved and unpaved roads and bridges.

44. The county seat of Big Horn County is located in Hardin, Montana. The city of Hardin was specifically excluded from the Crow Indian Reservation in 1937. Act of August 31, 1937, 50 Stat. 884. Hardin provides numerous services to and is impacted

by activities on the ceded strip as evidenced by its budgets. Big Horn County budgets on a county-wide basis for all necessary public services, including road construction, maintenance, and improvements, provisions for health and welfare services, fire, ambulance and police protection, and all normal incidental requirements of county services. Big Horn County operates a hospital and nursing home located in Hardin. Big Horn County has exclusively provided these services to the portion of the ceded strip in Big Horn County to the exclusion of the Crow Tribe and the Bureau of Indian Affairs. Examples of general governmental activities provided by Big Horn County within the ceded strip include functions of the County Commissioners' office, the County Assessor, the Clerk and Recorder, Treasurer, County Clerk, Justice of the Peace, County Attorney, and County Extension Office.

45. There are 202 miles of road responsibility located on the ceded strip in Big Horn County. The Big Horn County government is the only governmental agency which maintains and repairs state secondary highways within the county. Neither the Bureau of Indian Affairs nor the Crow Tribe contributes to the maintenance of state secondary highways on the ceded strip.

46. Big Horn County, to the exclusion of the Crow Tribe and the Bureau of Indian Affairs, has fought all fires on the ceded strip in Big Horn County.

47. Big Horn County provides substantial education facilities and services on the ceded strip. High School District No. 1 is located partly on the ceded strip.

48. Treasure County is the exclusive provider of police services, judicial services, and general governmental services in that part of the ceded strip located in Treasure County, including district court, juvenile court, fire protection services, ambulance services, road and bridge construction and repair, a medical clinic, sanitary landfill services, all schools and related services, and through interlocal agreement with Rosebud County, services of the county to indigents.

49. The fire service and ambulance service are manned by volunteers who receive either no compensation or nominal compensation.

50. A large majority of the population in Treasure County resides on the ceded strip.

51. Treasure County's total budget has increased nearly fivefold since 1970 while tax revenue has only doubled. Treasure County has deleted or reduced services as a result, specifically deleting all library services, all mental health services, and delaying or postponing bridge repair, road maintenance, and construction. In recent years, Treasure County has levied the legal maximum rate for its general governmental levy, and since 1975 it has levied the legal maximum rate for the road and bridge funds.

52. Treasure County has approximately 11,000 acres of non-fee patent lands located on the ceded strip for which it receives no tax revenues or payments in lieu of taxes from the federal government, the Crow Tribe, or any other government. Treasure County provides all governmental services, including fire protection, law enforcement, and the other services for these lands.

53. Yellowstone County provides a full range of governmental services which are available to residents on that portion of the ceded strip within Yellowstone County. Yellowstone County maintains about 335 miles of roads in the ceded area. It also maintains seven parks located within the ceded area in Yellowstone County.

54. The Crow Tribe provides little or no governmental services to the ceded strip, and it has not exercised and does not exercise general civil jurisdiction in the ceded area. Neither the Crow Tribe nor the Bureau of Indian Affairs provides fire protection, roads, police, or other governmental services on the ceded strip. None of the Crow Tribe's ordinances apply on the ceded area, and in its constitution the Tribe has disclaimed jurisdiction outside of the boundaries of its reservation.

*Jurisdiction and Services Related to Coal Mining on the Ceded Strip*

55. Coal mining has an extensive, pervasive effect, both direct and indirect, on state and local government. The state and county governments provide numerous facilities, assistance, and services, to coal mining, which enable coal development everywhere in the state to occur in an orderly manner. The costs of these facilities, assistance, and services are difficult to document and quantify in their entirety, but the total cost is substantial.

56. State government is affected both in specific service provisions and general governmental activities by coal development occurring anywhere in the state including areas affected by the Westmoreland mine. The state government incurs costs in responding specifically to coal mining activities, both on and off the ceded strip, and to incremental demands placed on the government by coal development. Organizations and people associated with coal development have access to and utilize the entire array of state governmental activities, including those provided by the judicial, legislative, and executive branches.

57. The state and its political subdivisions had responsibility for and incurred the costs of developing and maintaining the governmental and physical infrastructure that allowed development of coal on the ceded strip. Westmoreland Resources has utilized and had the advantage of various services, facilities, or governmental structures that were in place when its mining activities commenced. These services, facilities, and governmental infrastructures were developed, maintained, and financed at substantial cost by the state and local governments.

58. It is not possible to identify and quantify the total extent of coal-related demands on or use of state services generally, or Westmoreland's demands on or use of state services. The state and the ceded strip counties have provided extensive services to and regulated the ceded strip and the Westmoreland mine. There are numerous examples demonstrating that such services are extensive and substantial. For example, the Montana Department of Commerce, which administers the Montana Coal Board grants, has made numerous grants to the area affected by Westmoreland's mining operation. The Montana Department of Health and Environmental Sciences inspects the Westmoreland Mine at least five times annually and has provided operational assistance for sewer lagoons in communities near the Westmoreland Mine. The Montana Department of Highways has constructed and maintained highways in the vicinity of the Westmoreland Mine. The Department of Justice has provided highway patrol and fire marshal activities in the vicinity of the Westmoreland Mine. The Montana Department of Labor and Industry has provided safety and health inspections at the Westmoreland Mine and provides the unemployment and workman's compensation programs for employees at the Westmoreland Mine.

59. Governmental services used by and available to the Westmoreland Mine are indistinguishable in form from those available to other mines operating in Big Horn County and elsewhere in Montana.

60. With regard to mining and reclamation at Westmoreland's Mine; Montana has historically taken the lead and continues to take the lead and do the bulk of the regulatory work. Westmoreland's Mine is regulated in the same manner as any other surface coal mine in Montana.

61. The Montana legislature has enacted numerous mining and reclamation requirements at the insistence of its citizens. Westmoreland's mining operation has been developed and conducted pursuant to Montana's mining and reclamation and environmental requirements.

62. Numerous state permits and approvals may be required in conjunction with coal mining. The State of Montana and its political subdivisions have issued a number of permits and approvals for the Westmoreland Mine.

63. The Montana Department of State Lands has issued numerous permits and prepared several environmental impact statements on the Westmoreland Mine. The Department also reviews and inspects

the Westmoreland Mine on a regular basis, and it has issued a number of notices of violation to Westmoreland.

64. The Montana Department of State Lands, even after the passage of the Federal Surface Mining Control and Reclamation Act (SMCRA), still has the primary role with regard to regulation of mining and reclamation at Westmoreland's Mine.

65. The Crow Tribe does not have an approved mining and reclamation program which applies to the ceded area. SMCRA provides that before Indian tribes may become eligible to administer a mining and reclamation program, Congress will have to amend SMCRA, and Indian tribes will have to take various actions before the tribes can be eligible and can implement a mining and reclamation program. Neither Congress nor the Crow Tribe have taken these necessary actions.

66. The Crow Tribe does not have jurisdiction to provide services on the ceded strip. The Tribe has not provided and will not provide services to the Westmoreland Mine.

67. The roles of the federal government and the Crow Tribe with regard to coal development are limited to leasing and monitoring of production. The role of the BIA is limited primarily to receiving payments and determining how much coal is mined. The BIA responsibilities with regard to the Westmoreland Mine do not extend beyond those in the lease.

70. The only functions performed by the Crow Tribe or the BIA on the ceded strip relate to the Tribe's status as royalty owner and not to its status as sovereign. Because the Crow Tribe is not responsible for governmental services associated with coal development in the ceded strip, its interest in the ceded strip is limited to the interests of any other coal lessor.

*Impacts of Surface Coal Mining on the Ceded Strip*

71. In addition to responsibility for providing the infrastructure which enables coal development in the state, and more particularly on the ceded area, to occur, and for responding to ongoing administra-tive and service demands from Westmoreland's and others' mining activity in Montana, the state and its political subdivisions have jurisdiction over, and thus responsibility for, responding to deleterious socioeconomic, political, and governmental consequences of coal mining.

72. Impacts of coal mining are characterized by a boom and bust cycle.

73. The effects and impacts of coal mining and related activities are not limited to direct impacts of mining or mine-related activities themselves. Environmental and socioeconomic effects occur which are geographically disbursed and indirectly related to project activities but which nevertheless have the potential to require state and local governmental response.

74. An important function of state government is to assume responsibility for responding to unforeseen effects of activities such as coal mining. Despite all efforts to anticipate serious adverse effects, and despite permitting and bonding requirements, the risks of significant, costly, unforeseen effects still exist. It is the responsibility of the state to obtain compensation for assuming these risks on behalf of the state's citizens.

75. The impacts caused by coal mining and related activities, including impacts from the Westmoreland Mine, can only be partially identified and documented at this time. Significant problems of measurement and quantification prevent an accurate and complete estimation of many of those impacts. Many of the effects and costs associated with coal mining are currently unknown. For example, reclamation is not yet complete, and its degree of success is uncertain.

76. Some impacts and effects of coal mining can be currently identified, but it is difficult to quantify precisely and entirely the costs and impacts associated with a particular coal mine. The nature of the effects of coal mining do not allow such complete quantification, and governmental accounting systems are not designed to track service provisions or utilizations by geographic area, taxpayer, or purpose.

77. The land ownership patterns, and the distribution of environmental and socioeconomic effects of coal mining, particularly at Westmoreland's mine on the ceded strip place the responsibility and burdens for response to these effects on state and local governments, in a manner similar to that of other coal mining activities in Montana.

78. Because few Crow Indians live on the ceded strip, the Tribe has a limited interest in insuring that the environment of the ceded strip and the public services available on the ceded strip are protected and maintained.

79. There is no evidence that the Crow Tribe provides any response to the impacts from mining on the ceded area.

80. Impacts from Westmoreland's mine are both socioeconomic and environmental. Some have occurred or will occur in the short term, and others will occur after a longer period of time. Some have occurred or will occur in the immediate vicinity of the mine, including the ceded strip, and others have occurred or will occur statewide.

81. Certain environment impacts can be measured, identified, and associated with the Westmoreland Mine at this time. For example, Westmoreland's mining activity has increased and will continue to increase the concentration of air borne particulates and other pollutants. There are surface and ground water effects or potential effects associated with Westmoreland's mine which may be substantial but which may not be known for a relatively long time. The Westmoreland Mine has short-term and perhaps long-term effects on soils, vegetation, and wildlife. Because reclamation at the Westmoreland Mine has only occurred over a relatively short time, it is too soon to determine what the effects of the Westmoreland Mine will be on vegetation. The effects on wildlife caused by the Westmoreland Mine depend significantly on long-term results of reclamation.

82. The Westmoreland Mine has caused impacts on state and county roads in the area requiring construction of certain roads and increased maintenance to others.

83. The socioeconomic effects of the Westmoreland Mine are also difficult to identify and document in their entirety at this time. The state of Montana and its political subdivisions, however, have incurred the major socioeconomic burdens associated with the Westmoreland Mine and assumed the risk for further adverse impacts. For example, most of the employees at the Westmoreland Mine live off the reservation, primarily in Hardin, Montana. The Westmoreland Mine has also indirect socioeconomic effects in other areas of Montana, including Big Horn, Yellowstone, and Treasure Counties.

84. There have been substantial impacts upon residents of Big Horn and Treasure Counties as a result of the Westmoreland Mine arising from the construction of the railroad spur to that mine, increased rail traffic, and increased vehicle traffic. These impacts caused changes in the lifestyles of the local residents, and many have not been compensated by Westmoreland, the Tribe, or the United States.

85. There are timing and jurisdictional mismatches of revenues and demands resulting from the Westmoreland Mine. For example, Treasure County has experienced impacts from the Westmoreland Mine to its county roads, law enforcement, and other programs which have not been offset by property or gross proceeds taxes from the Westmoreland Mine.

86. The responsibilities to respond to effects of the Westmoreland Mine to date have fallen upon the state and county governments and not upon the Crow Reservation or Crow Tribe.

*Leasing of Tribally-Owned Coal—The 1938 Act*

87. The development of minerals held by the United States in trust for the Crow Tribe on the ceded strip, at least after 1968, has been subject to the provisions of the 1938 Indian Mineral Leasing Act (1938 Act), 25 U.S.C. § 396a–396g.

88. The leasing activity with regard to coal located in the ceded area, including the lease issued to Westmoreland for Tract III, has taken place under the 1938 Act and the

regulations promulgated under that Act, 25 C.F.R. § 211.1–.30 (1983).

89. Crow coal can now also be developed pursuant to the Indian Mineral Development Act of 1982, 25 U.S.C. § 2101, et seq. The only actual development of Crow-owned coal, however, has taken place under the authority of the 1938 Act.

90. Westmoreland's lease was issued under the 1938 Act.

*The Need for Revenues on the Crow Reservation*

91. Evidence presented at trial showed that there are enormous unmet needs on the Crow Indian Reservation for additional revenues to fund essential governmental programs and services for the Crow people in the areas of housing, health, employment, land acquisition, law enforcement, welfare, and education. While some of the witnesses whose testimony concerned the needs of the Crow people sought amounts of funding that might be difficult to attain even in prosperous areas, all of the witnesses identified basic needs in their specialty areas that the Crow Tribe, even with federal and state assistance, is unable to provide due to insufficient revenues.

92. Revenues gained from the development of tribally-owned coal reserves, through taxation, royalty collection, or by any other legally-sanctioned means, could significantly assist the Tribe in developing a more effective tribal government and a stronger economic base.

*Montana's Coal Taxes*

93. In 1975, Montana enacted statutes that impose on coal mine operators a severance tax on each ton of coal produced in the state and a gross proceeds tax on the sale of each ton of coal produced in the state. Mont.Code Ann. §§ 15–35–101 to 111 (1983) and §§ 15–23–701 to 704 (1983).

94. The Montana Coal Severance Tax, Mont.Code Ann. § 15–35–103, is "imposed on each ton of coal produced in the State." "Produced" means "severed from the earth." Mont.Code Ann. § 15–35–102. The tax is measured by the value of the "contract sales price" of the coal which is defined as "the price of coal extracted and prepared for shipment f.o.b. mine, excluding that amount charged by the seller to pay taxes paid on production...." Mont. Code Ann. § 15–35–102. The statutory rate of tax varies from 3 to 30% of the value of the coal, depending upon the heating quality of the coal and the method by which it is mined. Mont.Code Ann. § 15–35–103.

95. Montana's coal taxes are paid quarterly by the producers, Mont.Code Ann. § 15–35–104, who then pass them forward to their utility company customers according to the terms of their coal contracts.

96. Montana has made provision for the disposition of funds gained through the coal severance tax. Mont.Code Ann. § 15–35–108. The major recipient is a permanent trust fund which was approved as a constitutional amendment by referendum. Mont. Const. Art. IX § 5. The purpose of the constitutional trust fund is to address environmental and socioeconomic impacts which may arise in the future and which may be consequences of the cessation of large-scale coal mining in Montana. The trust fund contains only moneys collected pursuant to the coal severance tax. The principle of the fund may only be invaded on a three-fourths vote of the Montana Legislature. The Legislature may, however, appropriate the interest income earned by the fund. Approximately 25% of the coal severance tax moneys collected between July 1, 1977, and December 31, 1979, were allocated to the trust fund; 50% of the collections after that date go into the fund.

97. The remaining severance tax moneys are allocated to a variety of uses. The two largest uses are a "local impact and education trust fund account," which has received between 18 and 28% of the severance tax revenues, and the state's general fund, which has received between 19 and 40% of severance tax revenues. The remaining revenues have gone to state equalization aid to public schools, a coal area highway improvement fund, archeological preservation, various cultural projects, park acquisition and management, an alternative energy research fund, the general

funds of the counties where the coal is mined, county land use planning, and a sinking fund servicing renewable resources development bond accounts. Mont.Code Ann. § 15–35–108.

98. The Gross Proceeds from Coal Tax is imposed on "each person engaged in mining coal." Mont.Code Ann. § 15–23–701. Each person mining coal must file with the State Department of Revenue an annual report that must include, among other things, a statement of the number of "tons of coal extracted, treated, and sold from the mine during the taxable period" and "the gross yield or value in dollars and cents derived from the contract sales price." *Id.* The Department of Revenue transmits the valuation of the gross proceeds of the mine to the county assessor of each county in which the coal mines are located. Mont.Code Ann. § 15–23–702. The county assessor then enters the value on the assessment role, *id.*, and transmits a tax assessment to the county treasurer, who collects the taxes due from the coal operator. Mont.Code Ann. § 15–23–703.

99. The gross proceeds tax enacted in 1975 is substantially a reenactment of the net proceeds tax on coal at substantially the same effective rate. The net proceeds tax was first enacted in 1981. The tax generates revenue for the counties, school districts, and other local taxing entities. The rate of the gross proceeds tax is set by the local taxing entities' mill rate which is dependent upon revenue needed to operate.

100. All of the benefits of governmental services resulting from Montana's coal taxes are available to all citizens, including members of the Crow Tribe.

101. Montana's coal tax allocation structure has made it possible to make grants to communities located within the boundaries of the Crow Reservation, as evidenced by a number of Coal Board grants to the communities of Lodge Grass and Wyola, provisions in the Montana coal tax law specifically identify Indian tribes as being eligible for coal board grants.

102. Impact moneys are available from the state to aid in mitigating impacts occurring on the reservation from coal mining on the ceded strip.

*History of the Coal Tax and its Legislative Justification*

103. Montana's coal taxes were influenced by Montana's history of boom and bust in the mineral industry, the apparent coal boom in Montana in the early 1970's, and Montanans' desire and the Montana constitutional obligation that resource development within Montana occur without harm to the residents and environment of the state.

104. Coal tax bills were introduced in the 1973 Montana Legislature. None passed, and the legislature established an interim legislative fossil fuel study committee. The interim study committee conducted extensive studies, held public hearings, conducted extensive investigation regarding coal sales and coal taxes, and considered the short and long term impacts of coal mining. The committee reported its findings and proposed severance and gross proceeds tax legislation. After extensive debate, the legislature overwhelmingly enacted Montana's current coal taxes.

105. As stated in the April 16, 1975, "Statement to Accompany the Report of the Free Joint Conference Committees on Coal Taxation:"

> In setting the level of the tax, the conference committee looked at the needs to be met. The objectives were to (a) preserve or modestly increase the revenue going to the general fund, (b) to respond to current social impacts attributable to coal development, and (c) to invest in the future, when new technologies reduce our dependence on coal and mining activity may decline. The conference concluded that a severance tax of 20% on low grade lignite and 30% on other coal, plus a gross proceeds tax running at around 4–5% on all coal, was necessary and equitable.

*Id.* at 1.

106. The Montana Legislature was aware of the potential impacts and costs of mining when debating Montana's coal severance and gross proceeds taxes. The legislature believed that other environmental

laws would not prevent or remedy all impacts and costs of coal mining and that a tax on coal operators was therefore necessary. Legislators supporting the coal severance and gross proceeds taxes were determined to have coal development pay its own way.

107. Because demands for services can occur both before mining operations begin and after they cease, the legislature took the position that reasonable and prudent response to large scale coal development required the establishment of a taxing and administrative structure that (1) collected adequate resources to cover current and future costs, (2) compensated the state and local jurisdictions for assuming the risk associated with these responsibilities, and (3) is flexible enough to address the issues of jurisdictional and temporal mismatch and cumulative effects. State taxing policy required that any tax levied also have uniform application, be efficient to collect, and provide a stable revenue flow.

108. The structure of Montana's coal severance tax and the distribution of coal severance tax revenues reflects the intent of the legislature to meet the needs of Montana with respect to coal mining. The structure of the tax was designed to:

(a) Allow the severance taxes on coal production to remain a constant percentage of the price of coal;

(b) stabilize the flow of tax revenue from coal mines to local governments through the property taxation system;

(c) simplify the structure of coal taxation in Montana, reducing tax overlap and improving the predictability of tax projections;

(d) accomplish the foregoing purposes by establishing categories of taxation which would recognize the unique character of coal.

Mont.Code Ann. § 15–35–101(2) (1983). The severance tax rates imposed were derived by the coal tax oversight committee based on its best estimate of the short and long-term costs to the state from coal mining.

109. Montana's coal taxes were not designed to prohibit coal development, but were designed to promote orderly development which would protect the environment and the interests of Montanans and to make coal development pay its fair share. A proposed moratorium on coal development in the 1974 Montana Legislature was defeated.

110. Montana's coal taxes were not designed to capture maximum economic rents or excess profits. The Montana Legislature recognized that coal development would place a variety of demands on state and local government and would benefit from the trained work force and organized society that resulted from state and local government activities. The legislature also recognized that large scale coal development imposed a risk of environmental impact on state and local governments, on surface owners, and on all residents of the state.

111. Montana's coal severance tax was designed to address some of the major problems associated with coal development. Tax revenues were intended to provide front end financing to communities and agencies faced with rapid increases in demands for various services. Severance tax revenues are and will continue to be used to remedy problems created by jurisdictional mismatches. Severance tax revenues are also set aside for the future and will be used to respond to problems, both foreseen and unforeseen, that will arise when coal mining operations cease.

112. The Montana Legislature and the interim coal committee have the Montana severance and gross proceeds taxes under continuous review, and all citizens and coal companies are given periodic opportunities to express their views on the appropriateness of the Montana coal taxes.

*The Crow Tribe's Coal Severance Tax*

113. On January 31, 1976, the Crow Tribe enacted its own coal severance tax code to tax coal mined on the reservation at a statutory rate of 25%.

114. In July 1982, the Tribe enacted a new code providing for taxation on the ceded strip. The 1982 severance tax code

has not been approved by the Secretary of the Interior for enforcement on the ceded strip. The Secretary has withheld approval because the Tribe lacks the power under its constitution to levy a tax off its reservation and because the Secretary has not determined whether such power exists as a matter of federal law.

115. Any tribal tax revenue is subject to future allocation. The Tribe's tax is a general revenue tax, and the Tribe makes no claim that it would be used to offset reservation or ceded strip impacts resulting from coal mining. The Tribe has no statutory provision to allocate coal development funds to mitigate impacts or provide coal mining-related services on the ceded strip.

116. Presently, about 60% of the revenue obtained by the Crow Tribe from coal development goes to per capita distribution to tribal members.

117. Because there has been no actual mining of coal by lessees on the reservation, no revenues have been collected under the Tribe's severance tax code. The Tribe's severance tax is not applicable presently to coal produced at Westmoreland's Absaloka Mine on the ceded strip.

118. In September 1982, Westmoreland and the Crow Tribe entered into an agreement under which Westmoreland agreed to pay to the Tribe "a tax" equivalent in amount to Montana's taxes, and the Tribe agreed to give Westmoreland credit for any severance and gross proceeds taxes that Westmoreland is required to pay to the State of Montana or its political subdivisions.

119. The arrangement under which Westmoreland agreed to pay the Tribe this "tax" was proposed by the Tribe's counsel and appears to have been motivated largely by the Tribe's desire to improve its position in this litigation.

120. The payments under this arrangement were denominated a tax to allow the producers to pass them forward to their utility customers under their coal contracts.

*Application of Coal Taxes to the Westmoreland Mine.*

121. Westmoreland Resources has been paying Montana's severance and gross proceeds taxes since 1975 pursuant to Mont. Code Ann. §§ 15–35–102 and 103. At year end 1982, Westmoreland had paid approximately $53,800,000 in severance taxes and approximately $8,100,000 in gross proceeds taxes.

122. Westmoreland has not paid any coal taxes to the Crow Tribe.

*Effect of Montana's Coal Taxes on the Tribe's Royalty Interest on Ceded Strip Coal*

123. There is no convincing evidence that the state's taxes affect the Crow Tribe's ability to obtain a reasonable royalty from Westmoreland.

124. The Tribe's first lease agreement with Westmoreland provided for a royalty of 17¼¢ per ton plus other benefits. Further negotiations in 1974 led to a lease amendment increasing the royalty payment to the Tribe to 35¢ per ton, or 6% f.o.b. mine price, whichever is greater. The 1974 agreement between the Tribe and Westmoreland also increases the royalty on future contracts to 40¢ or 8%, whichever is greater.

125. Under the 1974 agreement between the Tribe and Westmoreland, Westmoreland has agreed to renegotiate its royalty payments to the Tribe every ten years. The agreement provides that the renegotiated royalties will be set at or near the prevailing market rate.

126. The royalty payments which the Crow Tribe has negotiated from Westmoreland were recognized at the time as being among the highest anywhere, and the Tribe presented no evidence of any higher royalties being paid to any other Indian coal owner.

127. While the royalty percentage of the Tribe has increased since 1975, the percentage rate of the Montana severance tax has stayed the same, and there have in fact been adjustments to Montana's tax which reduce the effective rate of the tax, which, in turn, will reduce the disparity of total

income received by the Tribe and the State of Montana.

128. The Tribe received approximately $17,877,126 in royalties from Westmoreland through October 1983. In addition to royalties, the Tribe has received other benefits from Westmoreland. For example, the Crow Tribe has an employment preference provision in its agreement with Westmoreland which results in additional money and benefits to the Tribe.

*Effect of Montana's Coal Taxes on the Marketability of Ceded Strip Coal*

129. There is no convincing evidence in the record that the gross proceeds tax has prevented or impeded the marketing of the Tribe's ceded strip coal. There was also no testimony that any past or present negotiations to market Crow coal have focused on the gross proceeds tax as a marketing factor.

130. There are numerous factors which affect the marketability of Montana coal, and more specifically, the Tribe's marketing of its ceded strip coal. Although the cumulative effect of coal taxes is one of these factors, the evidence at trial showed that the tax rate, at least at present, is overshadowed by other factors.

131. During a period from 1965 to 1983, the uncertainties created by the Crow Tribe's failure to adhere to agreements or establish clear policies, procedures, and directives, regarding development of their coal became significant factors in the development or lack of development of tribally-owned coal.

132. In the early to mid–1970's, with the adoption of clean air legislation, projections of increased electrical demand, and the Arab oil embargo, there was a boom in the demand for western coal. The coal market since the mid–1970's has softened, and there is now little or no demand for additional coal. Many coal companies in several states presently have excess production capacity and have found it increasingly difficult to market coal.

133. The characteristics of coal from a particular mine are important to a utility when a decision is being made to purchase coal. The ash, chemical characteristics, and physical properties, such as moisture, BTU value, and contamination, are important considerations for existing coal-burning plants. The plants' characteristics also affect a utility's decision to purchase. For new coal-burning plants, these factors, along with delivered cost, possibility of future cost increases, environmental considerations, reliability of source, production capacity, reserves, and alternative sources influence the utilities' purchasing decisions.

134. Transportation costs are a major factor in the marketability of coal. It is generally acknowledged that the "delivered price" of coal is the critical economic factor in any purchaser's decision. A major component of the delivered price is the rail or transportation costs. Montana's coal taxes are a relatively small percentage of delivered price. Transportation costs and distances are the major factor in determining the logical marketing area for a mine's coal production. The railroads are in a position to significantly influence the marketing of a particular coal.

135. Montana's logical coal marketing area, which includes the upper midwest and the Pacific northwest, has experience less demand for coal since 1975 than Wyoming's logical market for coal, which is the south and southwest. Demand for coal in Montana's primary market in the midwest has been relatively soft because the demand for electricity and additional coal by utilities in the midwest has declined since the mid–1970's compared to the demand for electricity and additional coal in the south and southwest.

136. While the delivered price of coal is a critical economic factor in a purchaser's coal-sourcing decision, there are other non-economic factors which sometimes require a utility to purchase a higher-priced coal. For example, there are utilities in the midwest which have purchased coal from Wyoming which will have significantly higher delivered price than purchase of Montana coal because these utilities require the better quality of Wyoming coal for environmental reasons.

137. There is no evidence that Westmoreland has lost or will lose any particular coal contract because of Montana's coal taxes. In spite of the relatively low BTU quality of Westmoreland's coal and the high moisture content generally present in Montana coal, a Westmoreland representative expressed guarded optimism that Westmoreland could effectively compete for contracts to supply coal to three plants scheduled to be on line in the next few years. Westmoreland has a significant transportation advantage with respect to these three plants.

138. The continued competitiveness of Montana coal is also demonstrated by the fact that there have been new mines opened in Montana since the severance tax was enacted in 1975, and there have been new applications filed with the Montana Department of State Lands by other coal companies expressing a desire to open new mines in Montana. Further, Montana companies have had new contract sales since the adoption of Montana's coal taxes in 1975.

139. Based on the 1982 agreement between the Crow Tribe and Westmoreland, if the Crow Tribe prevails in this lawsuit the Tribe would receive a payment equal to the amount Westmoreland is presently required to pay to the State of Montana. Based on this agreement, there would be no change in the effect, if any, of the taxes on the marketability of ceded strip coal. The Court does recognize, however, that the Crow Tribe-Westmoreland agreement may be changed by further negotiation.

### CONCLUSIONS OF LAW

#### I.

The Court has jurisdiction of this matter under 28 U.S.C. §§ 1331, 1345, and 1362. Venue is established under 28 U.S.C. § 1391(b).

#### II.

■■■ It is inappropriate at this time to declare the rights of the parties respecting the validity of Montana's coal taxes assessed on coal produced within the external boundaries of the Crow Indian Reservation. Although the matter was considered on a motion to dismiss by both this Court and the United States Court of Appeals for the Ninth Circuit, the evidence adduced at trial indicates that there is no "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The decision to issue declaratory relief rests in the sound discretion of the trial court. *See Provident Tradesmen's Bank & Trust v. Patterson*, 390 U.S. 102, 126, 88 S.Ct. 733, 746, 19 L.Ed.2d 936 (1968). The Court is reluctant to declare whether or not the state's coal tax statutes are valid on the reservation because: (a) no severance or gross proceeds tax has been assessed or collected on the Crow Indian Reservation; (b) there is no surface coal mine on the reservation which produces coal arguably subject to the state's coal taxes; (c) although coal mining agreements have been reached between the Tribe and non-Indian lessees, the lessees have not entered into long-term coal contracts, and, because of a slumping coal market, the mines contemplated by the agreements may not come to fruition; (d) the record lacks detail with respect to surface coal mining on the reservation; and (e) the State should have an opportunity to reassess its position with regard to taxation of on-reservation coal after final resolution of the validity of the state's taxes on tribally-owned coal on the ceded strip.

#### III.

Title to undisposed-of minerals underlying the ceded strip is held in trust by the United States for the Crow Indian Tribe.

(a) The second treaty of Fort Laramie, 1868, which set apart the 8 million acre Crow Reservation for undisturbed use and occupation of the Crow Tribe vested all beneficial property interests in the Tribe, including the rights to the underlying minerals. *United States v. Shoshone Tribe,*

304 U.S. 111, 117–118, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1938).

(b) Under the 1904 Cession Act, the Tribe gave up all right, title and interest to the ceded strip, but until the lands covered by the Act were actually disposed of, the Crow Tribe retained a beneficial interest in them. The United States acted as trustee for the Tribe with respect to disposal of lands and payment of sale proceeds. *Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920); Act of April 27, 1904, 33 Stat. 352.

(c) When lands were disposed of under some of the homestead laws, *e.g.,* Act of February 27, 1917, 39 Stat. 944, only the surface estates were granted. The mineral estates were reserved to the United States, and the Tribe retained the beneficial interest in the minerals that were reserved. *See Ash Sheep Co. v. United States, supra.*

(d) The 1958 Act restoring undisposed of lands to the Crow Tribe expressly states that "all lands now or hereafter classified as vacant and undisposed-of ceded lands ... are hereby restored to tribal ownership." The vacant and undisposed of minerals underlying the ceded strip fall within this description and are embraced by this provision of the 1958 Act. Act of May 19, 1958, Pub.L. No. 85–420, 72 Stat. 121.

■ (e) In spite of the language designating approximate surface acreage to be restored on named reservations, the 1958 Act restored the minerals in the ceded strip to Crow tribal ownership. Act of May 19, 1958, 72 Stat. 121; *Cf.* Solicitor's Opinion M–34836, 59 I.D. 393 (1947); Solicitor's Opinion A–25219, 60 I.D. 174 (1948). The approximate acreage figure of 10,260.95 acres listed for the Crow Reservation creates an ambiguity on the face of the statute which can only be resolved by resort to legislative history. *See DeCoteau v. District Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975). The legislative history supports the conclusion that the 1958 Act restored the ceded strip minerals to the Crow Tribe. The two major related purposes of the 1958 Act, as revealed by its legislative history, were to accord equal treatment to the tribes that did not accept the IRA and to restore to tribal ownership all of the surface lands and minerals interests that had been temporarily withdrawn following the enactment of the IRA. *See supra* Findings of Fact 21–22. If the ceded strip minerals in which the Crow Tribe retains a beneficial interest were not restored to full tribal ownership by the 1958 Act, the Crow Tribe would not receive the same treatment as the tribes whose lands and minerals were restored under § 3 of the IRA, 25 U.S.C. § 463. *See* 60 I.D. 174 (1948); 59 I.D. 393 (1947). Similarly, excluding the Tribe's ceded strip minerals from the coverage of the 1958 Act would conflict with that Act's express purpose of fully restoring to tribal ownership all of the surface lands and minerals that had temporarily withdrawn in 1934.

■ (f) Courts must interpret statutes in a manner that will promote, not defeat, the purposes that Congress sought to achieve. *See Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 118, 103 S.Ct. 986, 994–95, 74 L.Ed.2d 845 (1983); *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 607–08, 99 S.Ct. 1905, 1910–11, 60 L.Ed.2d 508 (1979). Applying that principle of statutory construction to the 1958 Act inescapably leads to the conclusion that the "vacant and undisposed-of ceded lands" restored to the full beneficial ownership of the Crow Tribe include the previously undisposed-of mineral interests in the ceded strip in which the Tribe retained a beneficial interest.

(g) The undisposed-of ceded minerals underlying entered land were not added to and made a part of the Crow Reservation by the 1958 Act. The term "reservation status" has little significance in describing a tribally-owned mineral estate which lies outside the surface boundaries of a tribe's reservation. The 1958 Act's legislative history provides no support for the anomalous proposition that Congress extended governmental powers and attributes of a tribe's inherent sovereignty to the subsurface estate in an area outside the boundaries of a

diminished reservation where the surface is held predominantly by non-Indians.

## IV.

There exists no express authorization for the imposition of Montana's coal severance and gross proceeds taxes on the mining of coal held by the United States in trust for the Crow Tribe. The Supreme Court recently held that state authorization under the 1924 Indian Mineral Leasing Act, 25 U.S.C. § 398, to tax mineral production does not extend to leases issued pursuant to the 1938 Indian Mineral Leasing Act, 25 U.S.C. § 396a–396g. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

## V.

The Court of Appeals recognized that mining of coal on the ceded strip created a "further complexity" in analyzing the validity of Montana's coal taxes. *Crow Tribe of Indians v. State of Montana,* 650 F.2d 1104 at 1114 (9th Cir.1981). Because this case was before the Circuit on a motion to dismiss, the factual record was insufficient to allow the court to analyze fully the distinctions between state taxation on the ceded strip and state taxation on the reservation. This Court notes that the predominant focus of the Ninth Circuit's opinion is on the larger question of state taxation on the reservation. Insofar as this Court's conclusions depart from the Ninth Circuit's opinion, the Court believes them to be justified by the full factual record and by the jurisdictional vagaries applicable to the ceded strip which were elucidated at trial.

## VI.

Montana's coal taxes imposed on the production by a non-Indian mining company of coal held by the United States in trust for the Crow Indian Tribe outside the boundaries of the Crow Reservation are not preempted by federal law.

(a) An exercise of state jurisdiction is preempted when it directly conflicts with a federal enactment, *see, e.g., Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), or when federal law or policy so pervasively governs the targeted activity that there remains no room for the additional burdens sought to be imposed by the state. *See, e.g., Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965).

(b) Montana's coal taxes do not directly conflict with a congressional enactment because none exists which expressly bars the State of Montana from imposing its coal taxes on coal held by the United States in trust for the Crow Tribe. The Court finds this especially significant with respect to coal mined on the ceded strip. In *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), the Supreme Court, noting that it does not lightly imply tax exemptions, stated that tribal activities conducted outside the reservation present "different considerations" and that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Id.* at 148–49, 93 S.Ct. at 1270. The state urges that any fair reading of *Jones* leads to the conclusion that state coal taxes levied on the ceded strip are not preempted since Congress has not explicitly done so. While the Court agrees that the state's argument has force, it declines the opportunity to buttress its conclusion solely on *Jones.* Further analysis of federal policy underlying the 1938 Mineral Leasing Act, analysis which the Court of Appeals held to be applicable and which appropriately takes into account the tradition of Indian sovereignty, also leads to the conclusion that the Montana coal taxes are not preempted on the ceded strip.

(c) There exists no pervasive federal law or policy governing the leasing of tribally-owned coal that ousts a state tax on production of tribally-owned coal on the ceded strip.

(d) In determining whether a state law is preempted by pervasive federal law or policy, a court must undertake "a particularized inquiry into the nature of the state, federal, and tribal interests at stake...."

*White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980). The standards of preemption applied in Indian law differ from those that have emerged in other areas of law. "The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been preempted by operation of federal law." *Id.* at 143, 100 S.Ct. at 2583.

(e) The fact that the tribally-owned ceded strip coal lies outside the boundary of the diminished reservation is an important consideration in the preemption analysis. "The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the preemption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits." *White Mountain Apache Tribe v. Bracker,* 448 U.S. at 151, 100 S.Ct. at 2587.

(f) The Court of Appeals found that the 1938 Indian Mineral Leasing Act, 25 U.S.C. § 396a–396f, and the regulations promulgated under that Act, constituted the potential preemptive federal law in this case. The Ninth Circuit identified and directed this Court's preemption inquiry to three goals that Congress sought to achieve in enacting the 1938 Act:

> First, the Act sought to achieve uniformity in the law governing mineral leases on Indian lands.... Second, the 1938 Act was designed to help achieve the broad policy of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479 (1976), that tribal governments be revitalized.... Third, the 1938 Act was intended to encourage tribal economic development....

*Crow Tribe of Indians v. State of Montana,* 650 F.2d at 1112–13; *see Montana v. Blackfeet Tribe of Indians,* 105 S.Ct. at 2404 n. 5. The Tribe's arguments and evidence attempt to prove that the latter two goals are frustrated by the imposition of Montana's coal tax.

(g) State taxation of Crow coal on the ceded strip does not hinder the revitalization of Crow tribal government. The Court of Appeals determined that in the mineral leasing context, revitalization entailed increasing of tribal government's control over decisions to lease tribal lands and over conditions to be placed on leases. Evidence at trial did not show that the Montana taxes either deprived the Tribe of control in leasing its ceded strip coal or significantly affect the rate of development of coal mining on the ceded strip. Any deterrent in the marketing of tribally-owned ceded strip coal caused by the severance and gross proceeds taxes is overshadowed by the present marketing difficulties common to all Montana coal due to a decreased market for coal in markets traditionally served by Montana coal. Coal owned by the Crow Tribe has been further disadvantaged in the marketplace by the Tribe's inability to put a marketing program in place.

(h) Discouragement, if any, of tribal economic development caused by state taxation of tribally-owned coal on the ceded strip can be justified by the state's legitimate interests in raising revenue to offset the cost of services it provides on the ceded strip, to mitigate short and long-term impacts of mining, and to perpetuate the mineral wealth subject to its general civil jurisdiction. Contrary to the Tribe's assertion, the Ninth Circuit's opinion remanding this case does not require, at least with respect to ceded strip coal, that the state establish a mathematical equilibrium between the quantifiable costs of coal development and the revenue raised by its taxes to avoid a finding that the state's taxes are preempted by federal law. Instead, the Ninth Circuit recognized that a state's legitimate interests also include such unquantifiable interests as the value of a trained workforce, an organized government and system of laws, as well as the unquantifiable burden of future socio-economic and environmental impacts resulting from coal mining. *Crow Tribe,* 650 F.2d at 1114. The ceded strip lies within the general civil jurisdiction of the State of Montana and outside the civil jurisdiction of the Crow Tribe. The state legislature has articulated legit-

imate and exceedingly strong regulatory interests and responsibilities and has imposed its coal taxes accordingly. *Cf. White Mountain Apache Tribe*, 448 U.S. at 150, 100 S.Ct. at 2587. *Ramah Navaho School Board v. Bureau of Revenue*, 458 U.S. 832, 845, 102 S.Ct. 3394, 3402, 73 L.Ed.2d 1174 (1982). The state's coal taxes do not impair the Crow Tribe's ability to obtain reasonable royalty rates when tribally-owned coal is leased.

(i) Montana's coal taxes are not in conflict with tribal taxation in the ceded area. The Tribe's tax ordinances have not been approved by the Secretary of the Interior for application to off-reservation mining because the Tribe lacks power under its own constitution to tax outside the reservation boundaries. The Court notes that in 1983 the Secretary withheld approval for the Hopi severance tax in part on the ground that due process does not permit a tribe to tax an activity with which it has no governmental nexus. *See* Exhibit D–417. A challenge that the Hopi Tribe was not empowered by its constitution to impose an off-reservation severance tax on its coal was raised but not addressed in the opinion.

## VII.

Montana's severance and gross proceeds taxes levied on the production of tribally-owned coal on the ceded strip do not infringe "on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959).

■ (a) This "self-government test" is related to the preemption analysis insofar as federal law and policy encourage tribal self-sufficiency and economic development, but the right of tribal self-government serves as an independent barrier to the intrusive assertion of state regulatory authority over tribal reservations and members. *White Mountain Apache Tribe*, 448 U.S. at 142–43, 100 S.Ct. at 2583.

(b) In *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Supreme Court described the important considerations when the self-government test is applied to resolve a conflict between a state and an Indian tribe.

The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government on one hand, and those of the State on the other. While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated *on the reservation* by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is *directed at off-reservation value* and when the taxpayer is the recipient of state services.

*Id.* at 156–57, 100 S.Ct. at 2083 (citation omitted, emphasis added).

■ (c) *Washington v. Confederated Tribes of Colville* illustrates that the reservation boundary is a significant factor in balancing the interests of the state against those of the federal government and tribe. The self-government analysis has little applicability to cases such as this where the state seeks to tax a non-Indian company for activities engaged in outside the reservation because, while tribes do retain "attributes of sovereignty over both their members and their territory," *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975), a tribe's governmental powers which arise from its retained sovereignty do not extend beyond the reservation boundaries. In 1904 the Crow Tribe relinquished its inherent authority to regulate or tax on the ceded strip and there has been no showing here that such power has been expressly returned to the Tribe by the United States. The relationship between Westmoreland Resources, Inc., and the Crow Tribe is purely contractual. Outside the reservation boundaries, on the ceded strip, this relationship carries with it no consent by Westmoreland to submit to the retained

civil jurisdiction of the Crow Tribe. *Cf. Montana v. United States,* 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981). Thus, on the ceded strip, the Tribe's interest in raising revenues is weak because the Tribe lacks governmental power and other sovereign interests which require accommodation with state interests under the self-government analysis.

(d) In any event, the self-government analysis leads to the conclusion that the state's taxes on the production of tribally-owned coal on the ceded strip are valid. A mere interest in raising revenues, even though the Tribe is in dire need of revenues to provide needed services on the reservation and to strengthen its economic base, does not in and of itself invalidate the state tax. There must be some contact between the Tribe's governmental power and the activities sought to be taxed. The Crow Tribe lacks such a connection with the off-reservation mining of its coal. The Tribe does not provide services on the ceded strip nor is it responsible for the impacts traceable to coal mining on the ceded strip. The evidence shows that the impacts of mining and the responsibilities for provision of services predominantly fall off the reservation and onto the state and local governments. With respect to ceded strip coal, the Tribe is not seeking increased revenues from a value which is generated on the reservation. The Tribe's interest in its off-reservation coal is an ownership interest which is not substantially different than the interest held by any other coal lessor. The evidence shows that this ownership interest, the royalty interest, has not been impaired by the imposition of the state's coal taxes.

### VIII.

■ The Court concludes that the Tribe and its lessees cannot create a tax on coal produced on the ceded strip by agreement. The 1982 lease agreement between the Tribe and Westmoreland contains a clause under which Westmoreland agreed to pay the Tribe a "tax" equal to the amount due under Montana's severance and gross proceeds tax laws with a credit for amounts actually paid to the state and local governments. Payment under this arrangement, which is collectible only because payor has consented, is simply not a tax. *See In re Lorber Industries,* 675 F.2d 1062, 1066 (9th Cir.1982).

### IX.

Montana's taxes have not been shown to constitute an impermissible "multiple burden" on interstate commerce. In *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), the Supreme Court noted that an impermissible burden on interstate commerce could arise if both the state and tribe taxed the same mining activity or if one or both taxed the activity at a greater rate than their contact with the activity would justify. *Id.* at 158 n. 26, 102 S.Ct. at 912 n. 26. The Crow Tribe is not authorized to tax the production of coal on the ceded strip. Thus, the ceded strip is within the state's and not the Tribe's taxing jurisdiction. Therefore, the Court need not reach this interstate commerce issue with respect to the ceded strip as there can be no multiple tax burden.

### X.

■ The Tribe has also raised a claim that Montana's coal taxes on tribally-owned coal are invalid under the Indian Commerce Clause of the Constitution, Art. I, Sec. 8, Cl. 3. The Tribe claims that the taxes are invalid because they are not authorized by Congress or, at the least, they constitute an undue burden on Indian commerce. As the Tribe recognizes, however, the Supreme Court has found it unnecessary to modify the preemption analysis "to hold that on-reservation activities involving a resident tribe are presumptively beyond the reach of state law even in the absence of comprehensive federal regulation...." *Ramah Navaho School Board, Inc. v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 845, 102 S.Ct. 3394, 3402, 73 L.Ed.2d 1174 (1982). Therefore, the dormant Indian commerce clause cannot be used by the courts as an analytical avenue to the merits of cases such a that before this Court in addition to, or in lieu of, the preemption

analysis absent a change in position by the Supreme Court.

## XI.

This Court's finding that there is presently no approved tribal tax on the ceded strip negates the Tribe's contention that Montana must provide a credit against its taxes in the amount of analogous tribal taxes. The Court, therefore, need not entertain the merits of that claim.

## XII.

 Montana's coal taxes are not impermissible taxes on tribal trust property. The Tribe argues that because the taxes are in essence taxes on real property, the taxes must be viewed as being imposed ratably on both the producer's share and the royalty share. Consequently, the Tribe contends that the state cannot impose that portion of the tax attributable to the Tribe's royalty share. The Court concludes that Montana's taxes are not taxes on tribal trust property. Both the Montana Supreme Court and the Court of Appeals have held that the legal incidence of the coal taxes falls on the producer. *See Commonwealth Edison v. Montana,* 189 Mont. 191, 615 P.2d 847, 850 (1980), *affirmed* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981); *Crow Tribe,* 650 F.2d at 1110. The Court of Appeals has noted, however, that it did not specifically address the question of where the tax incidence on the Tribe's royalty interest lies. *See Crow Tribe v. Montana,* 665 F.2d 1390 (9th Cir.1982). The severance tax statute clearly requires the "coal mine operator" to file the tax return and pay the severance tax. Mont.Code Ann. § 15–35–104 (1983). There is no requirement that the mine operator pass the tax back to the royalty owner. Similarly, the producer must pay the gross proceeds tax and there is no requirement that the tax be assessed against the royalty interest. *See* Mont.Code Ann. §§ 15–23–701 to 704 (1983). The producer, not the holder of the royalty interest, is subject to the imposition of liens upon the coal mine and the producer's personal property should the taxes not be paid. *See* Mont.Code Ann.

§ 15–23–704 (1983). The evidence at trial shows that coal mine operators pass Montana's coal taxes forward to the consumer. Thus, Montana's coal taxes are not levied on tribal property. The royalty interest is merely a component of the f.o.b. price on which the taxes directed at the producer are calculated.

## XIII.

For the foregoing reasons, the Court concludes that the Montana Coal Severance Tax and the Montana Gross Proceeds from Coal Tax are valid insofar as they are applied to the production of coal held by the United States in trust for the Crow Tribe on the ceded strip.

An appropriate order shall issue in accordance with these Findings of Fact and Conclusions of Law.